**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---

AMINAH BLACK :
201 Charring Cross Drive :
Dover, DE 19904 :
  :
          Plaintiff, :
  : Civil Action No.: _____
    v. :
  : **JURY TRIAL DEMANDED**
QUEST DIAGNOSTICS INCORPORATED :
500 Plaza Drive :
Secaucus, NJ 07094 :
  :
          Defendant. :

---

## **COMPLAINT**

Plaintiff, Aminah Black ("Plaintiff"), by and through her undersigned attorneys, for her Complaint against Defendant, Quest Diagnostics Incorporated ("Defendant"), alleges as follows:

### **NATURE OF THE ACTION**

1. Plaintiff brings this action contending Defendant violated her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., by terminating Plaintiff in retaliation for her requesting FMLA-qualifying leave and interfering with Plaintiff's right to take leave under same.

### **PARTIES**

2. Plaintiff Aminah Black is a citizen of the United States and the State of Delaware, and currently resides at 201 Charring Cross Drive, Dover, DE 19904.

3. Upon information and belief, Defendant Quest Diagnostics Incorporated is a for-profit corporation operating and existing under the laws of the State of Delaware, with its principal place of business at 500 Plaza Drive, Secaucus, NJ 07094.

4. At all times relevant hereto, Defendant acted or failed to act through its agents, servants, and/or employees thereto existing, each of whom acted at all times relevant hereto in the course and scope of their employment with and for Defendant.

## JURISDICTION AND VENUE

5. Plaintiff filed the instant action within the statutory time frame applicable to her claims.

6. This is an action authorized under and instituted pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq.

7. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it is a civil action arising under the laws of the United States.

8. The venue in this district is proper pursuant to 28 U.S.C. § 1391(b), as the unlawful practices of which Plaintiff is complaining were committed in this judicial district, and because Defendant resides in this judicial district.

## FACTUAL BACKGROUND

9. Paragraphs 1 through 8 are hereby incorporated by reference, as though the same were fully set forth at length herein.

10. On or about July 24, 2019, Defendant hired Plaintiff in a role as a Mobile Phlebotomist and Examiner based out of Defendant's office location at 1006 W 9th Avenue #155, King of Prussia, PA 19406.

11. Plaintiff generally worked an average of forty (40) hours per week throughout the time period she was employed by Defendant.

12. Plaintiff's job responsibilities included screening Defendant's employees for COVID-19 and performing in-house life insurance application appointments.

13. Plaintiff's duties relevant to screening Defendant's employees for COVID-19 included taking temperatures, distributing COVID-19 masks, and completing log sheets.

14. Plaintiff's duties relevant to in-house life insurance application appointments included drawing blood, taking body measurements, performing urine collection, and completing paperwork.

15. Throughout the course of her employment with Defendant, Plaintiff received positive performance reviews, occasional praise from both supervisors and clients, and no justifiable discipline.

16. By way of example, Plaintiff received praise via email messages from her supervisors, Jeremy Whitley ("Mr. Whitley") and Michael Madison ("Mr. Madison").

17. Additionally, on or about December 12, 2019, Defendant awarded Plaintiff a Certificate of Excellence that recognized Plaintiff's "ongoing commitment to providing an excellent experience."

18. Upon information and belief, Plaintiff's job duties and responsibilities placed her in a position of high exposure and high risk of contracting COVID-19.

19. Specifically, Plaintiff was required to screen Defendant's employees for COVID-19 and also regularly to enter different homes and living spaces to draw blood, collect urine, and perform body measurements of life insurance applicants.

20. Upon information and belief, the elevated risks of exposure to and contracting COVID-19 posed by Plaintiff's job duties led similarly-situated co-workers, who held the same position as Plaintiff, to contract COVID-19.

21. By way of example, one of Plaintiff's coworkers who held the same position as Plaintiff, Mobile Examiner, is believed to have contracted COVID-19 on or about June or July of 2020.

22. This coworker took a leave of absence from work on or about June or July of 2020.

23. Upon information and belief, Defendant provided employees with a brochure entitled "Coronavirus (COVID-19) Quest Diagnostics Employee Policy."

24. The copy of this brochure distributed to Plaintiff was last updated on June 30, 2020.

25. The brochure noted, "Decisions about returning to worksites will be based on CDC, state, local, business, Environment, Health & Safety (EHS) and facility guidance and requirements."

26. Upon information and belief, at the time Defendant provided Plaintiff with the aforementioned COVID-19 employee policy brochure, the Centers for Disease Control and Prevention (CDC) recommended that employers require employees who had tested positive for COVID-19 and experienced COVID-19 symptoms to produce two negative COVID tests before returning to work.

27. The brochure listed symptoms that would put employees on notice that they might be infected with COVID-19.

28. Specifically, the brochure described, "symptoms that may signify COVID-19 (e.g., fever, respiratory symptoms), and later, "symptoms that may signify COVID-19 (e.g., fever, cough, respiratory symptoms, etc)."

29. Plaintiff began experiencing allergy-related migraines several years ago, and continued to suffer from these migraines on occasion during her employment with Defendant.

30. On or about Wednesday, August 5, 2020, Plaintiff developed a headache and body aches which she attributed to her recurrent migraines.

31. Upon information and belief, Defendant regularly checked the body temperatures of its employees at the location where Plaintiff was employed to screen for potential COVID-19 cases.

32. Upon information and belief, it was Defendant's policy to send employees home who registered an elevated temperature when screened at work, and Defendant required those employees who registered an elevated temperature to be cleared by a Medical Director as well as Environment, Health, & Safety (EHS) personnel before returning to work.

33. Defendant screened Plaintiff's temperature each day she worked during the week of August 5, 2020, and Plaintiff did not register an elevated temperature during any of these body temperature screenings.

34. Over the weekend, Plaintiff's developed additional symptoms including exhaustion, nausea, and lack of appetite.

35. On or about Monday, August 10, 2020, Plaintiff sent her supervisor, Mr. Madison, a text, informing him that she was feeling ill and thus could not come into work.

36. Specifically, Plaintiff's text to Mr. Madison stated, "I haven't been feeling good for the last couple days so I made an appointment with my doc for later I just didn't wanna give u too short of notice… i don't feel well enough to come in there with all those ppl amd I will keep u posted on what she says."

37. In response, Mr. Madison asked Plaintiff via text if she thought her illness was COVID-19 related, to which Plaintiff responded, "Im hoping its not but honestly it feels that way.

I've been having headaches body aches and just extremely exhausted m some nausea and lack of appetite."

38. Mr. Madison responded, "No worries try to rest up if you can and keep me posted on your results as soon as you know anything."

39. On or about August 10, 2020, Plaintiff had a virtual visit with her primary care physician, Dr. Priyanka Dixit-Patel, MD ("Dr. Dixit-Patel").

40. During this visit, Dr. Dixit-Patel informed Plaintiff that her symptoms suggested she had COVID-19 and instructed Plaintiff to get tested for COVID-19.

41. Dr. Dixit-Patel explained that she could not see Plaintiff in-person at the doctor's office due to the possibility that Plaintiff was infected with COVID-19 and contagious with the same.

42. Dr. Dixit-Patel stated that in order to see Dr. Dixit-Patel for an in-office visit, Plaintiff would need to take a COVID-19 test and test negative.

43. On or about August 10, 2020, Plaintiff informed Mr. Madison via text that Dr. Dixit-Patel advised Plaintiff to get a COVID test and that her symptoms resembled COVID-19.

44. On or about August 11, 2020, Plaintiff was tested for COVID-19 at MedExpress Dover, located at 15 South DuPont Highway, Dover, DE 19901.

45. On or about August 11, 2020, Plaintiff texted Mr. Madison informing him that she had been tested for COVID-19 and that the results would be available in three (3) to eight (8) days.

46. The following day, on or about August 12, 2020, Mr. Madison responded by texting Plaintiff, "Hey Aminah hope you are feeling better! I will follow up today and see what we need to do for you. Can you contact any apps and inform we will be in touch to reschedule and status the cases[?]"

47. On or about August 12, 2020, Mr. Madison texted Plaintiff, "You didn't go to Horsham yesterday right? Please do not go today or tomorrow."

48. Plaintiff responded, "No I didn't go and o wouldn't even attempt to with the way im feeling."

49. On that same date, on or about August 12, 2020, Mr. Madison asked Plaintiff via text, "How do you think you might have become exposed (working with applicants or Horsham?)"

50. Plaintiff texted back "Could be either of the two Mike I don't really know," to which Mr. Madison responded "Ok cool no worries I will reach out to HR now and see what we can do about pay and moving forward. Please let me know your results asap."

51. Mr. Madison then responded, "Ok cool no worries I will reach out to Hr now and see what we can do about pay and moving forward."

52. Plaintiff's COVID symptoms rendered her unable to work or perform regular daily activities.

53. On or about Thursday, August 13, 2020, Plaintiff texted Mr. Madison, informing him her current symptoms included headaches, body aches, nausea, extreme fatigue, and asthma flares.

54. Mr. Madison replied by asking, "Are you doing any better or the same?", to which Plaintiff responded, "The same."

55. Plaintiff then asked, "What is Hr saying?", to which Mr. Madison replied, "Rest up if you can I hope you get well soon! Just trying to track your schedule and figure out pay if your test is positive."

56. Mr. Madison's statements and conduct conveyed to Plaintiff that Defendant approved of her taking medical leave while sick with and recovering from COVID-19.

57. On or about Friday, August 14, 2020, Plaintiff was diagnosed with COVID-19 by Dr. Laura Suthar, MD ("Dr. Suthar").

58. Dr. Suthar signed and provided Plaintiff with a doctor's note which reads, "To whom it may concern, This note is to certify that [Plaintiff] was tested for COVID-19 on 8/11/2020. Patient results came back POSITIVE on 8/14/2020. Patient must self-quarantine for 14 days. Thank you!"

59. That same day, on or about August 14, 2020, Plaintiff sent Mr. Madison a text informing him that she tested positive for COVID-19.

60. Mr. Madison texted, "Oh no! How are you feeling now and did you just find out?", to which Plaintiff replied, "Not feeling my best and yes they called this morning."

61. On or about August 17, 2020, Plaintiff texted Mr. Madison an image of Dr. Suthar's doctor's note, which confirmed Plaintiff's positive COVID-19 test result and required Plaintiff to self-quarantine for 14 days.

62. Notably, the doctor's note was clean, legible, and unequivocal.

63. Mr. Madison acknowledged receipt of the doctor's note by replying to Plaintiff's text message.

64. On or about August 17, 2020, Plaintiff texted Mr. Madison inquiring about the procedures for returning to work.

65. On or about August 17, 2020, Mr. Madison texted Plaintiff, "To keep it 100 they are pushing to term you for not notifying when you first felt symptoms. I opened another case Friday with HR to fight their progression with that just waiting for someone to reach out. I'm really pissed with the way they are handling this situation . . . . they tripping and my manager won't help me but I'm going to do all I can without any support because they are wrong! . . ."

8

66. Plaintiff responded to Mr. Madison's text, stating, "I had a freakin headache for god's sake."

67. Mr. Madison replied, "Yeah it's crazy! I told them that and was like she thought it was allergies so she wasn't thinking about it and thought they would disappear and once she got worse, she told me first thing."

68. On or about August 25, 2020, Defendant terminated Plaintiff's employment.

69. Defendant informed Plaintiff that she was terminated for "Breach of Contract."

70. Following her termination, Plaintiff contacted the Unemployment Office, which informed Plaintiff that Defendant communicated to them that Plaintiff was terminated due to a lack of work.

71. However, during the time period immediately preceding her medical leave for COVID-19, Plaintiff was working more hours than she ever had worked.

72. Upon information and belief, there was ample work for Plaintiff to have done upon her return from medical leave, had she not been terminated.

73. Upon information and belief, had Plaintiff not been terminated, Defendant would have required Plaintiff to test negative for COVID before returning to work, per its policy.

74. The Unemployment Office ultimately approved Plaintiff's application for unemployment benefits following her termination.

75. It is believed and therefore averred that Defendant terminated Plaintiff's employment because she exercised her right to seek protected leave and/or receive treatment for her serious health condition, in violation of the FMLA.

76. As a result of Defendant's deliberate, willful, malicious, and unlawful actions, Plaintiff has suffered damages, including, but not limited to, loss of employment, promotion

benefits, earnings and earnings potential, loss of potential benefits, and other economic damages, and has also suffered mental anguish, emotional pain and suffering, emotional distress, humiliation, and damage to reputation.

### COUNT I
### THE FAMILY AND MEDICAL LEAVE ACT
### 29 U.S.C. § 2601, *et seq.*
### INTERFERENCE AND RETALIATION

77. Paragraphs 1 through 76 are hereby incorporated by reference as though the same were fully set forth at length herein.

78. Upon information and belief, Defendant maintained fifty (50) or more employees within seventy-five miles (75) of the location where Plaintiff was employed.

79. Upon information and belief, Defendant employs and employed fifty or more employees for at least twenty (20) workweeks in the current or preceding year, including the time period relevant to the allegations contained herein.

80. Therefore, Defendant is a "covered" employer under the FMLA, meaning the provisions of the FMLA apply to Defendant.

81. Plaintiff was an eligible employee under the FMLA, having worked for Defendant, a covered employer, for at least one year, and having worked more than 1,250 hours in the calendar year preceding her medical leave to diagnose, treat, and recover from COVID-19.

82. Plaintiff was therefore entitled to up to twelve (12) weeks of unpaid leave for her serious health condition.

83. Plaintiff provided adequate notice to Defendant of her need for medical leave by giving notice as soon as she became aware of the need for leave and as soon as was practicable, pursuant to 29 U.S.C. § 2612(e).

84. Defendant allowed Plaintiff to take FMLA leave in order to diagnose, treat, and enable her recovery from COVID-19, and as such, the doctrine of equitable estoppel bars Defendant from retroactively asserting Plaintiff was not eligible for leave.

85. Defendant willfully violated the FMLA by terminating Plaintiff for taking FMLA-qualifying leave and/or in retaliation for exercising her right to protected leave to seek treatment for her serious health condition.

86. Additionally, Defendant willfully violated the FMLA by failing to provide Plaintiff with the requisite twelve (12) weeks of available FMLA leave.

87. The aforementioned actions of Defendant constitute both retaliation and interference violations of the FMLA.

88. As a result of Defendant's actions, Plaintiff has suffered significant damages.

89. Plaintiff has, because of Defendant's wrongful termination of Plaintiff's employment, suffered loss of employment, promotion benefits, earnings and earnings potential, other significant benefits, emotional pain and suffering, emotional distress and humiliation.

**WHEREFORE**, as a result of the unlawful conduct of Defendant, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant her the maximum relief allowed by law, including, but not limited to:

    A.    Back wages, front pay, and bonuses in an amount to be determined at trial, but not less than one hundred and fifty thousand dollars ($150,000.00):

    B.    Liquidated damages;

    C.    Plaintiff's costs, disbursements and attorneys' fees incurred in prosecuting this action;

    D.    Pre-judgment interest in an appropriate amount; and

E. Such other and further relief as is just and equitable under the circumstances.

F. Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages as set forth by applicable law.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

**MURPHY LAW GROUP, LLC**

By: */s/ Michael Murphy, Esq.*
Michael Murphy, Esq.
Eight Penn Center, Suite 2000
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103
TEL: 267-273-1054
FAX: 215-525-0210
murphy@phillyemploymentlawyer.com
*Attorney for Plaintiff*

Dated: November 18, 2021

## **DEMAND TO PRESERVE EVIDENCE**

The Defendant is hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to Plaintiff's potential claims and her claims to damages, to any defenses to same, including, but not limited to, electronic data storage, employment files, files, memos, job descriptions, text messages, e-mails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.